## THE WESTMORELAND.

District Court, S. D. New York.
Feb. 19, 1936.

phate in bulk. The charter party provided that the charterer was to "load, stow and discharge cargo," and, further, "Cargo to be loaded on skin of vessel at charterer's risk." It contained a warranty of seaworthiness by the owner.

At Everett the interior of the barge was inspected by representatives of the charterer, after which the ammonia sulphate was loaded by stevedores in the charterer's employ, the master and crew of the barge taking no part. The cargo was placed in the hold in bulk, without containers and without dunnage of any kind, resting against the botton ceiling and the side ceilings. The barge then set out for Norfolk, in tow of a tug. The voyage was without incident until the tug and tow reached the vicinity of Cape May. Here heavy seas and strong wind were encountered, and for some hours the barge rolled badly. A quantity of water was found in the chain locker. The two steam pumps, one with suction forward and one with suction aft, were started. Shortly afterward the pumps jammed. It developed that they were plugged with ammonia sulphate. The fore pump was cleaned out and put into operation, but it soon became plugged again. The hand pumps were used, but they also became plugged. For the rest of the voyage there was no pumping.

On arrival at Norfolk the cargo was discharged. A substantial part on the bottom and along the sides proved to be wet and not readily removable. The barge having been placed in drydock, it was found that the space between the floor ceiling and the bottom was choked with wet ammonia sulphate, to remove which two bottom planks were taken off and a pressure pump put in. The pipes of the steam pumps were found full of ammonia sulphate and had to be replaced. Some caulking around the stem and sternpost was also done.

There are a few further facts. The pumps had been in good order prior to the trouble off Cape May. They sucked to four inches above the bottom. The ceilings were in good condition. In the ceilings, however, there were narrow seams at the turn of the bilge, one-eighth to one-fourth of an inch in width, due to drying out of the planks.

There is no mystery as to the origin of the cargo damage. The tossing of the barge caused some of the ammonia sulphate to sift down into the bilge water through the cracks in the ceiling, and it was not long before the mixture of water and ammonia

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Ezra G. Benedict Fox, both of New York City, of counsel), for libelant.

Lynch & Hagen, of New York City (Horace T. Atkins and Charles W. Hagen, both of New York City, of counsel), for claimant-respondent.

PATTERSON, District Judge.

The suit is for damage to a cargo of ammonia sulphate carried on the barge Westmoreland.

The Westmoreland was a wooden barge of the schooner type, designed and used for the coastwise trade. She generally carried cargoes of coal out of Norfolk. In September, 1932, the respondent made a charter of the barge to the libelant's assignor, Eastern Cotton Oil Co., Inc., for a voyage from Everett, Mass., to Norfolk, Va., to carry 1,000 tons of ammonia sul-

sulphate choked the pumps. With the pumps out of action, the water that leaked into the barge while it was straining could not be got rid of. The water rose above the floor ceiling and wet the lower part of the cargo. It is safe to say that no damage would have resulted if dunnage of canvas or paper had been used.

The carrier, though a private one only, was a bailee for hire, and on proof of shipment of cargo in good order and discharge in bad order the burden rests on the carrier to clear itself of liability. But the carrier clears itself when it proves that the' damage came about through stowage of the cargo on the skin of the vessel, and further proves that under the charter party responsibility for loading' and stowage was with the shipper, stowage on the vessel's skin being expressly stipulated to be at the shipper's risk. In such a case the shipper takes his own chances as to cargo damage which would not have happened but for loading on the skin of the vessel. The Harry F. Hooper, 42 F.(2d) 758 (D.C.N.Y.) is a case in point and is not distinguishable from this case.

It may be granted that where the damage is due to other causes and the loss would have occurred in the same way and to the same extent without stowage on the skin of the vessel, the carrier cannot escape liability merely by the stipulation that stowage on skin of vessel is at shipper's risk. In such a case there is no causal connection between the stowage on the skin of the vessel and the damage. The Joseph J. Hock, 70 F.(2d) 259 (C.C.A.2); The Chehaw, 54 F.(2d) 645 (D.C.N.Y.). Here, however, the stowage on the skin of the vessel, without dunnage of any kind, was the direct cause of the loss.

The validity of the stipulation is beyond question. In carriage by a public carrier, it may be that such a provision in a bill of lading would be void by reason of the Harter Act (46 U.S.C.A. §§ 190–195), as a clause purporting to relieve the carrier from liability for negligence in the loading, stowage, care, and custody of cargo. Here the respondent was not a public carrier. The clause is valid in a charter party where the whole cargo space is put at the disposal of the charterer and where it is the charterer who is to load, stow, and discharge the cargo.

The libelant urges that the barge was unseaworthy. Seaworthiness is a relative term, taking into account the vessel, the voyage, and the cargo. It is well known that wooden barges leak to some extent, and that they leak more when straining under a load in heavy seas. The Smyrna, 62 F. (2d) 1048 (C.C.A.4). The pumps are counted on to take care of minor leaks. This barge had no trouble down to Cape May, and the fact that there water came through under stress of weather does not indicate unseaworthiness at the commencement of the voyage. The leaks could not have been bad ones; if they had been, the barge with pumps out of commission would not have been able to continue the voyage to Norfolk without danger of sinking. The leaks were not unusual. What was unusual was the incapacity of the pumps, and that incapacity is chargeable to the stowage of a finely pulverized cargo in bulk without dunnage. I am of opinion that the small cracks in the ceiling did not render the barge unseaworthy. See The Harry F. Hooper, supra.

The loss was one at the charterer's own risk. The libel will accordingly be dismissed.