## THE SCIPIO.

O'DONNELL TRANSP. CO., Inc. v. SEABOARD COAL DOCK CO. et al.

No. 17486.

District Court, E. D. New York.

Sept. 15, 1947.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for respondents.

GALSTON, District Judge.

The libel in this action alleges that the barge Scipio was damaged by reason of improper loading by the respondent, the Seaboard Coal Dock Company, at the plant of the Dock Company at South Amboy, New Jersey, a terminal of the respondent, the Pennsylvania Railroad Company.

The barge having been brought to the dock, the loading of a cargo of bituminous coal was commenced on May 5, 1944. The cargo was consigned to New Haven, Connecticut. She was loaded with 1002 net tons, or 895 gross tons. The dimensions of the Scipio are 117.5 feet in length, 31 feet in beam, and 14.1 depth of hold, and she was built in 1920.

It was stipulated that the loading began at 10:43 P.M. on May 5th, and was completed at 11 minutes after 11:00 P. M. that same evening. Feeney, a representative of the libellant, on receiving word from the tug dispatcher of the Pennsylvania Railroad Company located at South Amboy, went to South Amboy and took with him a pump, arriving on May 6, 1944, at 2:30 P. M. The barge at that time was on the north side of the piers upon the mud, though at first it had been shifted to the south side. Feeney found the gas pump on the boat was working. He found there was hardly any coal in hatch No. 1; there was some in hatch No. 2, and No. 3 hatch was piled up a foot higher than the top of the cabin, as were hatches Nos. 4 and

5. There was much less coal in the two stern hatches than in hatches Nos. 3, 4 and 5. No. 1 was the bow hatch. The weight of the evidence is that there was overloading in the middle, which was the cause of the leak which developed. As Feeney said, such over-loading "springs the scarves on the side and it springs your chime seam in the barge, and it sometimes springs the logs on the barge." It was found that leakage was observable through the scarves.

The condition on May 7th was described by another witness who corroborated Feeney. The superintendent of the respondent Seaboard Coal Dock Company admitted that in places the cargo in the 3rd, 4th and 5th hatches was a foot or two above the combing, and that the cargo in hatches Nos. 6 and 7 was below.

Conley, a marine superintendent of the O'Donnell Transportation Company, also examined the barge on May 7th and corroborated Scouten and Feeney with respect to the loading.

The photographs in evidence show that a redistribution of the coal was necessary after the original loading.

I am unable to accept the respondent's contention that the barge was properly loaded; even though the bargee signed a receipt that the loading and trim were in a manner approved by him. The bargee is dead, and no explanation of the signing of the receipt by him was available to the libellant. The facts as heretofore recited, and as testified to by other witnesses, indicate conclusively to my mind that the barge was not properly loaded.

As to seaworthiness, it appears that in February, 1944, the barge had been overhauled at Perth Amboy. In 1938, ninety-eight new bottom planks were installed on the barge, and other work done. Moreover, it appears that the Scipio had been working for the James McWilliams Blue Line for several months prior to May 5th, 1944. During that period cargoes were delivered without any claim or notice of damage to them. It is claimed, however, that the vessel was unseaworthy because the gasoline pump was not working effectively, and the libellant sent an auxiliary pump to assist in syphoning the water. There is testimony that three feet of water were found in the stern by Feeney on his arrival on May 6th. The record is barren as to how much of that water, if any, was attributable to any failure of the gasoline or the hand pump which were on board the barge. If the damage which was caused by the overloading was aggravated by any failure of the barge pumps, the record does not show to what extent, if any, the failure of the pumps contributed. The obligation of the respondents was properly to load the barge. See Seaboard Sand & Gravel Corporation v. James Hughes, Inc., et al., D.C., 56 F.Supp. 468; Texas Gulf Sulphur Co., Inc., v. Barge Martin P. Horan, 1935 A.M.C. 1143; Kelly v. Overseas Shipping Co., Inc., D.C., 7 F.2d 732, affirmed 2 Cir., 7 F.2d 734.

It is agreed that no liability has been established against the Pennsylvania Railroad Company, and the libel against it will be dismissed, but the libellant may have a decree against the Seaboard Coal Dock Company. Before the master, however, the respondent will be privileged to show to what extent, if any, the failure of the pumps aggravated the damage, and the decree will so provide.